764 N.W.2d 641 (2009)
277 Neb. 728
STATE of Nebraska EX REL. COUNSEL FOR DISCIPLINE OF the NEBRASKA SUPREME COURT, Relator,
v.
Harold Titus SWAN, Respondent.
No. S-08-110.
Supreme Court of Nebraska.
May 8, 2009.
*642 John W. Steele, Assistant Counsel for Discipline, for relator.
Robert B. Creager, of Anderson, Creager & Wittstruck, P.C., Lincoln, for respondent.
WRIGHT, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
PER CURIAM.

NATURE OF CASE
Harold Titus Swan was convicted in federal court of making and delivering a writing containing a statement known to be false. As a result of this conviction, Swan was charged with violations of Canon 1, DR 1-102, and Canon 7, DR 7-102, of the Code of Professional Responsibility (Code). Swan appeals the referee's conclusion that his conviction is clear and convincing evidence sufficient to impose discipline under the Code.

BACKGROUND
Swan has been licensed to practice law in the State of Nebraska since September 1981. From 1983 to 2006, he served on the board of directors of the First National Bank of Holdrege (Bank). Swan estimated that he performed approximately 5 to 10 hours of legal work per month for the Bank. One of the Bank's customers was CLN Enterprises (CLN), which operated a grain elevator in Atlanta, Nebraska.
During the relevant time period, grain prices were at historic highs, so farmers were looking to lock in the high prices for crops in future years. Grain *643 elevators across the country were utilizing hedge-to-arrive (HTA) contracts to price grain for future delivery. An HTA is a forward pricing contract whereby the grain elevator hedges, on behalf of the farmers, the current trading price at the Chicago Board of Trade so the farmers can lock in that price, even though the farmers will not deliver the grain until a future date. The overall contract price is adjusted by the price of the grain at the time the farmer delivers.
The Bank loaned money to CLN based on these HTA contracts. Unexpectedly, the price of corn continued to rise, which decreased the value of the contracts. This required CLN to make margin calls on the contracts. A margin call is a broker's demand on an investor using borrowed funds to deposit additional money or securities in the margin account so that the account maintains a minimum value.
If CLN failed to make the margin call payments, it was expected that the Chicago Board of Trade would liquidate a sufficient number of the contracts to bring CLN's account up to the minimum required value. The result of this would be that the farmers would lose the locked-in contract price. Further, the elevator could "go under," resulting in the farmers' having claims against the elevator or defaulting on their own loans.
CLN borrowed money from the Bank to cover the margin calls, and this cost was passed on to the farmers when they settled the contracts by delivering the grain. CLN was ultimately liable for only the interest on the money borrowed to cover the margin calls.
By spring 1996, CLN was nearing its lending limit with the Bank. Exceeding the lending limit was considered to be an unsafe and unsound banking practice, so the Bank's loan review officer proposed having the farmers borrow the money from the Bank to cover their own margin calls and forward the money to CLN to make the margin call payments. The premise was the same as when CLN was borrowing the money directlythe principal amount of the loan would be taken out of the amount the farmers received when they delivered the grain and CLN would be responsible for the interest on the loans.
The practice of having the farmers borrow the money and forward it to CLN enabled CLN to continue financing the margin calls without directly exceeding its lending limit with the Bank. On April 8, 1996, Swan was asked to draft an addendum to the HTA contracts that would outline how the margin calls were going to be financed. Swan was told that the addendum was needed because the individual farmers wanted assurances that CLN would properly credit the farmers for the interest paid to the Bank to maintain the margin calls.
Swan drafted the addendum, and CLN presented the addendum to farmers who had signed HTA contracts with CLN and who agreed to borrow money from the Bank to cover their own margin calls. Due to the changes in grain prices, many of the farmers lost money on the contracts. In turn, the Bank sued some of the farmers on the loans used to make the margin calls. Some of the farmers complained that CLN had misrepresented the addendum to imply that they would not be personally liable on the loan for any deficiency.
The Office of the Comptroller of the Currency investigated the Bank's actions in 1997. The comptroller concluded that the Bank's loans to the farmers should have been considered part of CLN's credit limit rather than separate lines of credit. A second investigation in 2002 concluded that the Bank's records "`did not reveal *644 any clear attempt by prior management to knowingly and deceptively hide the truth'" of the HTA loans. However, there was a subsequent criminal investigation of the Bank and its loan officers and principals which resulted in the criminal indictment of Swan and others in the U.S. District Court for the District of Nebraska.
Swan was originally indicted in a multimember conspiracy. However, pursuant to a plea agreement, he pled guilty to a misdemeanor charge related to his drafting of the addendum as it related to one farmer. Swan pled guilty to a violation of 18 U.S.C. § 1018 (2006), which reads as follows:
§ 1018. Official certificates or writings
Whoever, being a public officer or other person authorized by any law of the United States to make or give a certificate or other writing, knowingly makes and delivers as true such a certificate or writing, containing any statement which he knows to be false, in a case where the punishment thereof is not elsewhere expressly provided by law, shall be fined under this title or imprisoned not more than one year, or both.
The information filed in federal court alleged:
On or about April 8, 1996, in the District of Nebraska, HAROLD TITUS SWAN, the defendant herein, being an attorney licensed to practice law by the State of Nebraska, and a Member of the Board of Directors of the ... Bank ..., a national bank located in Holdrege, Nebraska, and authorized by the law of the United States to make and give writings, did knowingly make and deliver as true such a writing, to wit, an Addendum to [the HTA] Contract, which he knew to contain false representations and statements, in that HAROLD TITUS SWAN, authorized to act as an attorney for the... Bank ..., made and delivered the Addendum to [the HTA] Contract, knowing the document would be used to facilitate nominee loans from farmers with [HTA] Contracts for the benefit of [CLN,] d/b/a Atlanta Elevator, Inc., a grain elevator located in Atlanta, Nebraska, by representing in the Addendum that the farmer would not be responsible for payment of the nominee loan, when in truth and fact, SWAN knew the bank would attempt to recover loan proceeds from farmers if [CLN] failed to pay on the nominee loan, contrary to the terms of the Addendum, and Swan deliberately avoided learning the truth.
In violation of Title 18, United States Code, Section 1018.
At the disciplinary hearing, Swan submitted an affidavit which included "Exhibit B," a one-page document titled "H. Titus Swan's Version of Events," which was a statement of facts Swan provided to the government that he agreed were true. The document included these statements:
Mr. Swan was aware of a high probability that the Addendum would be used to facilitate nominee loans from farmers with CLN/HTA contracts to benefit CLN ... and that if CLN ... failed to repay the CLN/HTA related notes, the Bank would seek repayment from those farmers. Although Mr. Swan was aware that the Addendum would likely be used to facilitate nominee loans and that the Bank would seek payment from the farmers in the event CLN did not pay the loans, Mr. Swan deliberately avoided learning the truth of these matters. As a consequence, the ... Bank ... thereafter sought repayment of the loan proceeds from D & B Partnership when CLN ... was unable to repay the notes. D & B Partnership was required to repay *645 $62,500.00 on its notes to the ... Bank....
Mr. Swan acknowledges that the circumstances and his conduct constitute willful blindness with respect to the written Addendum to the [HTA] contract. Mr. Swan's willful blindness and actions as a licensed attorney and Director of the ... Bank ... constitute a false writing, in violation of 18 U.S.C. § 1018 as alleged in the Information.
On October 9, 2007, the federal court sentenced Swan to 3 years' probation, including 3 months on electronic home monitoring. He was also ordered to attend a victim impact class, perform 180 hours of community service, pay a fine of $25,000, and make restitution in the amount of $110,000 to two farmers.

ASSIGNMENT OF ERROR
Swan assigns as error the referee's finding that the Counsel for Discipline was relieved of its burden of proof on whether Swan committed acts that violated the Code because Swan pled guilty to a federal criminal charge.

STANDARD OF REVIEW
[1,2] A proceeding to discipline an attorney is a trial de novo on the record.[1] To sustain a charge in a disciplinary proceeding against an attorney, the charge must be supported by clear and convincing evidence.[2]

ANALYSIS
[3] The issue is whether Swan's criminal conviction can be a basis for attorney discipline. Pursuant to Neb. Ct. R. § 3-326, for purposes of disciplining an attorney, a criminal conviction is conclusive evidence of the attorney's conduct that is the subject of the disciplinary action. Swan argues that the referee erred in considering only the elements of the crime of which he was convicted in determining whether he violated the Code. He claims that the referee should have examined the addendum prepared by Swan in analyzing whether his underlying conduct violated the Code.
[4] The Code governs all attorney conduct occurring before September 1, 2005, and the Nebraska Rules of Professional Conduct (Rules) govern attorney conduct occurring after that date. The disciplinary action at bar was commenced as a result of Swan's plea of guilty to criminal charges in federal court on July 18, 2007. The federal conviction was based on Swan's conduct in 1996 and, therefore, would be governed by the Code. Although the charges and the referee's findings cited the Code, Swan addressed the issues using both the Rules and the Code almost interchangeably and the Counsel for Discipline presented arguments using only the Rules.
We conclude that it is Swan's 1996 conduct that is subject to discipline; therefore, the Code governs this action. However, we agree with the parties that the outcome in this case would be the same under both the Code and the Rules. The relevant portions of the Code are:
DR 1-102 Misconduct.
(A) A lawyer shall not:
(1) Violate a Disciplinary Rule.
....
(3) Engage in illegal conduct involving moral turpitude.
(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
....

*646 DR 7-102 Representing a Client Within the Bounds of the Law.
(A) In his or her representation of a client, a lawyer shall not:
....
(3) Conceal or knowingly fail to disclose that which the lawyer is required by law to reveal.
....
(5) Knowingly make a false statement of law or fact.
....
(7) Counsel or assist a client in conduct that the lawyer knows to be illegal or fraudulent.
The Counsel for Discipline filed charges against Swan on January 31, 2008, alleging violations of DR 1-102 and DR 7-102 of the Code based on Swan's federal court conviction. The Counsel for Discipline relied on § 3-326(A), which states:
For the purposes of Inquiry of a Complaint or Formal Charges filed as a result of a finding of guilt of a crime, a certified copy of a judgment of conviction constitutes conclusive evidence that the attorney committed the crime, and the sole issue in any such Inquiry should be the nature and extent of the discipline to be imposed.
In his report, the referee initially found that § 3-326(A) relieved the Counsel for Discipline from the burden of proving by clear and convincing evidence that Swan violated the Code and that the only matter to decide was the proper discipline.
Swan's plea of guilty to the elements of the crime described in 18 U.S.C. § 1018 is conclusive evidence of his conduct, which the referee found to be clear and convincing evidence that Swan violated DR 1-102 and DR 7-102 of the Code. The information charged that Swan
did knowingly make and deliver as true... an Addendum to [the HTA] Contract, which he knew to contain false representations and statements ... knowing the document would be used to facilitate nominee loans from farmers with [HTA] Contracts for the benefit of [CLN] by representing in the Addendum that the farmer would not be responsible for payment of the nominee loan, when in truth and fact, SWAN knew the bank would attempt to recover loan proceeds from farmers if [CLN] failed to pay on the nominee loan, contrary to the terms of the Addendum....
The conduct described above is clear and convincing evidence of misrepresentation, in violation of DR 1-102(A)(4), and the making of a false statement of fact, in violation of DR 7-102(A)(5).
We have relied on criminal convictions as evidence of a violation of the Code in prior attorney disciplinary cases. In State ex rel. NSBA v. Duchek,[3] an attorney pled guilty to one count of willful failure to file an income tax return in the U.S. District Court for the District of Nebraska. The Nebraska State Bar Association filed disciplinary charges against the attorney "in connection with the charges filed against him in the U.S. District Court."[4] We found that the attorney's willful failure to file an income tax return constituted misconduct involving moral turpitude and was a violation of the Code.[5]
In State ex rel. NSBA v. Steier,[6] the attorney was convicted of giving an illegal *647 gratuity to a public official, a federal felony. We stated that "[t]he conviction evidences conduct that constitutes a violation of Canon 1, DR 1-102(A)(1), (3), and (6), of the Code of Professional Responsibility and a violation of his oath as an attorney."[7]
In State ex rel. NSBA v. Dolan,[8] the Committee on Inquiry of the First Disciplinary District filed charges against an attorney after he was found guilty in federal court of bankruptcy fraud and conspiracy to commit bankruptcy fraud. The committee alleged that the attorney's criminal conviction violated his oath of office as an attorney and DR 1-102(A)(1), (3), and (5) of the Code. We agreed and disbarred the attorney.
In the case at bar, by pleading guilty to the federal offense, Swan admitted to the criminal conduct described in the information. Section 3-326(A) permits the Counsel for Discipline to consider Swan's conviction as conclusive evidence that he committed the federal crime. Such conduct may be considered as evidence when determining whether Swan violated the Code. Accordingly, the referee found by clear and convincing evidence that Swan's criminal conduct violated DR 1-102 and DR 7-102. We agree with the referee's findings.
[5,6] After determining that an attorney has violated the Code or the Rules, the remaining issues in a disciplinary proceeding against an attorney are whether discipline should be imposed and, if so, the type of discipline appropriate under the circumstances.[9] Each attorney discipline case must be evaluated individually in light of its particular facts and circumstances, and requires the consideration of any aggravating or mitigating factors.[10]
[7,8] In an attorney discipline proceeding, an isolated incident not representing a pattern of conduct is considered as a factor in mitigation.[11] Continuing commitment to the legal profession and the community and cooperation during disciplinary proceedings are also mitigating factors.[12]
[9] The actions that prompted this proceeding occurred 13 years ago, and the evidence indicates that this was an isolated incident in Swan's 27-year legal career. Additionally, Swan offered many letters of support from members of the bar and others in his community attesting to his character and integrity as a lawyer as well as his positive involvement in the community. The Counsel for Discipline noted that Swan assisted the banking authorities in sorting out the confusion caused by the Bank's questionable lending practices and cooperated during this disciplinary proceeding. Although the propriety of a sanction must be considered with reference to the sanctions imposed by this court in prior cases presenting similar circumstances,[13] the unique facts of this case are unlike any other case we have considered.
Considering all of the mitigating circumstances in this case, we agree with the *648 referee that a public reprimand is appropriate.

CONCLUSION
Based on the record in this case, we conclude that Swan violated DR 1-102 and DR 7-102 of the Code. It is the judgment of this court that Swan should be, and hereby is, publicly reprimanded for conduct in violation of the Code. Swan is directed to pay costs and expenses in accordance with Neb.Rev.Stat. §§ 7-114 and 7-115 (Reissue 2007) and Neb. Ct. R. §§ 3-310(P) and 3-323 within 60 days after an order imposing costs and expenses, if any, is entered by this court.
JUDGMENT OF PUBLIC REPRIMAND.
HEAVICAN, C.J., and CONNOLLY, J., not participating.
NOTES
[1] State ex rel. Counsel for Dis. v. Hubbard, 276 Neb. 741, 757 N.W.2d 375 (2008).
[2] State ex rel. Counsel for Dis. v. Wadman, 275 Neb. 357, 746 N.W.2d 681 (2008).
[3] State ex rel. NSBA v. Duchek, 224 Neb. 777, 401 N.W.2d 484 (1987).
[4] Id. at 777, 401 N.W.2d at 485.
[5] Duchek, supra note 3.
[6] State ex rel. NSBA v. Steier, 246 Neb. 584, 520 N.W.2d 779 (1994).
[7] Id. at 584, 520 N.W.2d at 780.
[8] State ex rel. NSBA v. Dolan, 255 Neb. 44, 581 N.W.2d 892 (1998).
[9] See State ex rel. Counsel for Dis. v. Davis, 276 Neb. 158, 760 N.W.2d 928 (2008).
[10] Id.
[11] State ex rel. Counsel for Dis. v. Mills, 267 Neb. 57, 671 N.W.2d 765 (2003).
[12] See, State ex rel. Special Counsel for Dis. v. Sivick, 264 Neb. 496, 648 N.W.2d 315 (2002); State ex rel. NSBA v. Frank, 262 Neb. 299, 631 N.W.2d 485 (2001).
[13] See Frank, supra note 12.